## NATIONAL LABOR RELATIONS BOARD v. LOCAL 57, INTERNATIONAL UNION OF OPERATING ENGINEERS, et al.

No. 4659.

United States Court of Appeals,
First Circuit.

Feb. 3, 1953.

Arnold Ordman, Washington, D. C., (George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Assistant General Counsel and Abraham Siegel, all of Washington, D. C., on brief) for petitioner.

Albert J. Hoban, of Providence, R. I. (Coffey, Ward, Hoban & Reed, Providence, R. I., on brief) for respondents.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

HARTIGAN, Circuit Judge.

The National Labor Relations Board, pursuant to the National Labor Relations Act, as amended, 61 Stat. 136, 29 U.S.C.A. § 151 et seq., has petitioned this court for enforcement of its order of December 11, 1951, under § 10(c) of the Act, against the respondent Local 57, International Union of Operating Engineers and its business agent, John White.

The respondent union includes some employees of the M. A. Gammino Construction Company, hereinafter called Gammino, a general contractor and builder engaged in the construction of roads, bridges, and airports, with its principal office in Providence, Rhode Island. In the course of its operations, it requires a great amount of materials and equipment which are shipped to it across state lines. The respondents concede that the Board has jurisdiction over the operations of Gammino and that, if the respondents engaged in unfair labor practices, such unfair labor practices affected commerce.

The Board found that respondents violated §§ 8(b) (2) and 8(b) (1) (A)[1] of the Act by executing an illegal union-security contract with Gammino, by engaging in discriminatory hiring-hall practices, and by causing Gammino to discriminatorily discharge John Lamantia in violation of § 8(a) (3) of the Act.

The respondents, in their brief, state that they do not contest the entry of a decree enforcing those portions of the Board's order which relate to the June 2, 1950, contract with Gammino and to the hiring-hall referral card system, except to the extent that such an order should not have been issued, and the findings on which the order was based should not have been made, without joining Gammino as a respondent. They also contend that the contract and the hiring-hall practices did not result in the discharge of Lamantia.

This admission by the respondents narrows the issues in this case so that the following recitation of the facts surrounding the hiring and firing of Lamantia is all that is necessary to disclose the basis of

---

1. The relevant portions of § 8(b) provide:
   "(b) It shall be an unfair labor practice . for a labor organization or its agents—
   "(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 7: * * *
   "(2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership; * * *."

those findings of the Board which are disputed by respondents.

While working at the Hillsgrove airport in Rhode Island, Gammino was using a Marion crane to dig trenches and lay pipe under hazardous water conditions. This work required the services of a competent drag-line operator and Gammino was having difficulty in obtaining the services of such an operator. On Friday, June 30, the man who had been operating the Marion crane was discharged and master mechanic Fiore advised President Frank Gammino that a new operator was needed immediately to replace him. Job superintendent Farone conveyed the same information to Vice President Thomas Gammino. Frank Gammino told Fiore to hire John Lamantia —known from previous employment with the company as a competent operator,—subject only to the condition that if respondents referred a competent operator, Lamantia "couldn't go to work." Thereupon Frank Gammino called respondent White, the local business agent of the Union, complained about incompetent operators and demanded a competent operator for the Marion crane by the next working day. Frank Gammino emphasized that unless his demand was met, he would hire Lamantia whom he had previously employed on a Connecticut job. White assured Frank Gammino that he would comply, and that evening Thomas Gammino made a similar demand of Joseph R. Murray, an employee of the Union, who replied that he would meet the demand.

On Sunday morning, July 2, Fiore telephoned foreman Traficante and told him that Frank Gammino had ordered the hiring of Lamantia to operate the Marion crane. Accordingly, that evening Traficante communicated with Lamantia, told him to report to the Marion crane the following morning, and directed that he try to get there a little early "so we can have some trenches opened up." Lamantia, a member of the New Haven, Connecticut, local of the same international union, and conversant with respondent Union's procedures, promptly asked "How about the Union", and Traficante replied "That will be taken care of. It's Frank's (Gammino) orders."

In the meantime, on Saturday, July 1, John E. Adams, a member of respondent Union for eight years, was issued a referral card for the job Lamantia was hired to fill.

On Monday morning, July 3, Lamantia proceeded directly to the Marion crane pursuant to Traficante's instructions and started work. Shortly thereafter Adams, armed with his referral slip from Local 57, reported to timekeeper Bussey who pointed out the Marion crane to Adams. Adams proceeded to the crane and when he found Lamantia already operating it, sought unsuccessfully to have Lamantia get off. Adams then returned to the time office and by telephone reported the situation to White who immediately instructed Adams to insist upon replacing Lamantia and if that failed, to "tell the other boys not to go to work." Lamantia persisted in his refusal and Adams told all but one of the workers that White had ordered them to "come off the job."

While these events were taking place, White ordered Roland W. Burt, a trustee and auditor of the Union, to go to the job site and "see what the trouble is down there." By the time Burt arrived, the men had already quit their work, and Burt directed that they were not to go back to work until Lamantia was off the job. Bussey, witnessing these events, immediately reported to Byron Gammino, one of the company officials, and at his direction, Lamantia was promptly discharged. Thereupon the men returned to work pursuant to orders from White who had been told of the company's action. Within a few minutes thereafter, Adams took over the operation of the crane at Thomas Gammino's direction.

On the entire record, the Board found that the respondents caused the discriminatory discharge of Lamantia in violation of § 8(b) (2), and § 8(b) (1) (A).

The Board issued the usual order to cease and desist and to make whole Lamantia "in the manner provided in Pen & Pencil Workers Union, Local 19593, 91 NLRB 883,

and F. W. Woolworth Company, 90 NLRB 289," and to take certain affirmative action.

Respondents in their brief rely upon the following points: (1) the Board erred in denying respondents' motion to add Gammino as a respondent; (2) the finding of the Board that the respondents caused the discriminatory discharge of John Lamantia is not supported by substantial evidence on the record considered as a whole; (3) the order of the Board should be modified so that it will become operative only if and when Lamantia becomes legally and physically qualified for employment with Gammino as a crane operator; and (4) the method of computing back pay provided in the Board's order is not appropriate in this case.

The first point relied upon is without merit. Respondents contend that in order to find that they caused "an employer to discriminate against an employee in violation of subsection (a) (3) . . ." the employer must be before the Board. We think the language of the Act does not support this interpretation. It is true that the language requires that the Board must find that the employer has committed an unfair labor practice in violation of § 8(a) (3) in order to find that the Union has violated § 8(b) (2), but this does not mean that the employer is an indispensable party in finding against a union.

The answer to respondents' contention that Gammino was an indispensable party is that the Board lacks initiatory power under the Act. Section 10(c) provides that an unfair labor practice may be found and an order may be issued only against "any person named in the complaint." See General Electric X-Ray Corporation, 76 NLRB 64 (1948). Section 10(b) allows a complaint to be issued only against a person charged with an unfair labor practice. Thus, under this statutory scheme, the choice of respondent or respondents lies with the person aggrieved and an employee who is illegally discriminated against by joint action of the union and employer, may name as respondent either the union or the employer or both. It seems to us that the Board lacks statutory authority to add an employer as a respondent where a charge like this is made against the union and its officer.

These statutory limitations on the power of the Board were acknowledged in National Labor Rel. Board v. Newspaper & Mail Del. Union, 2 Cir., 1951, 192 F.2d 654, 657, where the court said: " * * * we recognize the necessity of allowing the Board to make a finding that a union has caused a violation of Section 8(a) (3) in a case where complaint is made only against the union and not against the company. * * *" In this opinion, the Second Circuit also cited with approval the Board's decision in National Union of Marine Cooks and Stewards, C. I. O. and George C. Quinley, 92 NLRB 877, where the Board stated the statutory construction which we think is correct. In that case, the Board said, at page 878: " * * * We note that an attempt by a labor organization to cause a discriminatory discharge is a violation of Section 8(b) (2), even though it would never be possible to find a violation of 8(a) (3) by the employer where he resisted the attempt and refused to discriminate. Necessarily, therefore, the statutory words 'in violation of subsection (a) (3)' are merely descriptive with reference to an attempt. These same quoted words do not take on a new and different meaning when the attempt succeeds—they again merely describe the kind of discharge it is unlawful for the union to demand * * *."

This line of authority was recently followed in National Labor Relations Board v. Radio Officers' Union, 2 Cir., 1952, 196 F.2d 960, 965, certiorari granted, 1952, 344 U.S. 852, 73 S.Ct. 91, with the brief statement: " * * * Nor was there error in failing to join the company as a respondent in this proceeding. A finding that the union has violated § 8(b) (2) can be made without joining the employer and finding a § 8(a) (3) violation. * * *" We agree with the Board and with the Second Circuit in holding that an employer is not an indispensable party in finding a union violation of § 8(b) (2).

The respondents' second point is likewise without merit. They argue that the record does not support the conclusions of

the Board because the testimony of Lamantia should not be considered as support for the Board's findings and without that testimony, there is not substantial evidence showing that the respondents caused his discriminatory discharge.

■ A footnote in the Decision and Order explains the Board's only reversal of the Trial Examiner's rulings as follows: "* * * At the hearing the Respondent offered to prove that Lamantia, the charging party, was receiving disability payments from an insurance company at the time when he was attempting to get employment and holding himself out as physically able to work. The Trial Examiner rejected this offer of proof, and the Respondent urges that the evidence it offered is relevant and material to the consideration of Lamantia as a credible witness. We believe that this contention has merit, and we have considered this offer of proof. Lamantia's testimony, however, in the main is substantiated by other positive evidence. Moreover, the essential facts upon which the Trial Examiner has based his conclusion are proved by evidence other than the testimony of Lamantia. Accordingly, we find that the Respondent has not been prejudiced by the Trial Examiner's rejection of its offer of proof that Lamantia was receiving disability compensation at the time he was discharged from the Company's employ."

The Trial Examiner found that "Respondent Local and Respondent White, who signed the 1946 contract as business manager and who was entrusted and charged with enforcing it, joined with Gammino in creating the conditions which would result in discrimination. They thereby attempted to cause Gammino to discriminate against employees in violation of Section 8(a) (3) of the Act, thereby violating Section 8(b) (2) * * *. It is held that by their practicing the referral card system as it now exists, with its element of necessity and its working assessments, Respondents have caused Gammino to discriminate against employees in violation of Section 8(a) (3), thereby infringing Section 8(b) (2); and have also restrained and coerced employees in their rights, guaranteed in Section 7, not to join or assist Respondent Local, thereby violating Section 8(b) (1) (A)."

In urging that their illegal actions did not cause the discriminatory discharge of Lamantia, the respondents rest their contention upon two points: (a) the illegal contract and hiring practices were not operative in Lamantia's case; and (b) Lamantia's employment was conditional upon the unavailability of a union man.

■ Neither of these points is well taken. There is substantial evidence on the record considered as a whole, aside from Lamantia's testimony, that respondents caused his discharge solely because his hiring did not conform to the union's illegal requirements then in force. We are not persuaded to the contrary by the subtle argument that the respondents were only seeking to assure the employment of their own man for this particular job, pursuant to a telephone conversation between Gammino and White. Furthermore, we think there is substantial evidence, aside from Lamantia's testimony, showing that he was unconditionally hired.

■ Respondent's third point in regard to Lamantia's alleged physical and legal disability is equally unpersuasive. When the men were ordered to quit their work in the effort to displace Lamantia from the crane he was operating, there is no evidence that they were doing so because he was physically incapacitated or because he lacked a Rhode Island license. We think it is unrealistic under these circumstances to assert at this point that these were the motives for the respondents' conduct.

■ Respondents' last point with regard to the method of computing back pay by calendar quarters as ordered by the Board in this case has been determined conclusively by the Supreme Court in N. L. R. B. v. Seven-Up Bottling Co., 73 S.Ct. 287, and under the authority of this decision we must uphold the back pay portion of the order. Our opinion in N. L. R. B. v. Saxe-Glassman Shoe Corp., 1 Cir., 201 F.2d 238, reached the same result.

A decree will be entered enforcing the order of the Board.